IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 2, 2019

**JOHN SIMMONS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-00653        Chris B. Craft, Judge**
_____

**No. W2019-00520-CCA-R3-PC**
_____

The Petitioner, John Simmons, pleaded guilty to first degree murder and was sentenced to life imprisonment.   The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel and alleging prosecutorial misconduct. After a hearing, the post-conviction court denied relief.  The Petitioner appeals the denial, maintaining that he received ineffective representation in violation of his constitutional right to counsel.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Sharon Fortner, Memphis, Tennessee, for the appellant, John Simmons.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

On April 13, 2015, the Petitioner pleaded guilty to first degree premeditated murder and was sentenced to life imprisonment.  The following summary of the facts is from the trial court's order denying the Petitioner's motion to suppress.

> Brendia Westbrook Simmons, the wife of the [Petitioner], was killed by gunshot on July 19, 2012.  The victim and [the Petitioner] had been leasing a home at 6390 Hunters Place Drive in Memphis, Tennessee for a couple of

years, but two or three months prior to her death they had been having marriage problems and she had separated from her husband, moving into a hotel while he continued to stay at Hunters Place Drive. The day of her death, the [Petitioner]'s mother Diane Simmons had called his sister, Juwanda Simmons, stating that the [Petitioner] was threatening to kill Brendia. Around 5 or 6 pm, Brendia went to her daughter Denecia (a/k/a Cynthia and Neecie) Westbrook's home to do laundry, and during this time she left in her car to get ice at the Exxon around the corner. The Exxon was also around the corner from the house on Hunters Place Drive. The trip would have taken only 5 or 6 minutes, and so after an hour Neecie became worried because her mother had not returned and was not answering her cell phone. She and her sister Candice Westbrook drove around looking for her or her car (Walmart, etc.), including going by the house on Hunters Place Drive, knocking on the door and receiving no answer. During this search, the [Petitioner] showed up driving Brendia's car at his mother's house (Diane Simmons) with Diane's sister, his aunt, Geraldine Simmons present, and told his mother he had killed Brendia. When she asked "Where is Brendia now, John," he answered "Ma, I killed her. She's at the house." He then threw Brendia's car keys to Geraldine's fiancée/husband Willie, and he threw them back to the [Petitioner], who left in Brendia's car.

The Petitioner did not file an appeal of his case but timely filed a post-conviction petition on April 1, 2016. The post-conviction court appointed an attorney and held a hearing on the petition.

The Petitioner testified that his trial attorney ("Counsel") was appointed and that Counsel met with him numerous times. The Petitioner recalled that, during these meetings, Counsel would discuss the case with him. Counsel told the Petitioner about the State's proof against him, and the Petitioner provided his "side of the story." The Petitioner said that he initially believed Counsel "understood what was going on" but that, as the trial date neared, Counsel's "attention span went from one-hundred to zero." The Petitioner wanted Counsel to "pull" phone records. Counsel assured the Petitioner that he would do so, but the phone records were never "pulled." The Petitioner explained that the State alleged that he called his mother and told her he was going to kill his wife, so he wanted the phone records to refute this allegation.

The Petitioner testified that he met with the investigator for his case and that he provided potential witnesses for her to interview. The Petitioner was unsure of what the investigator did with the list, but she told him she could not locate one witness, "Elder Kiddington."

The Petitioner testified that Counsel told him what was in the discovery but never showed him the discovery. He agreed that Counsel reviewed the Petitioner's constitutional rights with him and that the trial court did as well. The Petitioner said that he had understood what it meant to set his case for trial and that it was his decision to pursue a trial. As the trial neared, the Petitioner emphasized with Counsel the need to find "Elder Kiddington." Even though the attempts to find this witness had been unsuccessful, Counsel agreed to "look for them." On the Friday before the trial was to begin, Counsel told the Petitioner that the prosecutor's office had found "Elder Kiddington" and that he was to testify for the prosecution. Counsel learned that the information this witness was to provide was not helpful to the defense but consistent with the State's theory of the case. The Petitioner said that, even with this information, he still wanted to proceed to trial. The Petitioner confirmed that he and Counsel had been preparing for the trial.

The Petitioner testified that, on the day of trial, he believed that the State was going to pursue the death penalty. Counsel told the Petitioner that the Petitioner's mother and "Elder Kiddington" were to testify against him and "that they would definitely be able to find you guilty." Based upon this information, the Petitioner believed that he "didn't . . . ha[ve] a chance in the world," so the Petitioner agreed to plead guilty. The Petitioner stated that had he known he could not receive the death penalty, he would have proceeded to trial. He explained that if he had known that the most severe punishment he could receive if convicted at trial was a life sentence, he would have "rolled the dice." The Petitioner said that he felt he had no choice about entering the guilty plea given the false information Counsel gave him.

The Petitioner agreed that during his plea colloquy he testified that he was "happy" with Counsel's representation. He explained that he was not being truthful during the plea colloquy because he was afraid the trial court would not accept the guilty plea if he expressed dissatisfaction with Counsel's performance, and he feared receiving the death penalty if he proceeded to trial.

The Petitioner testified that he told Counsel that he no longer wanted Counsel to work on his case. According to the Petitioner, Counsel responded that the trial court would not allow Counsel to withdraw. Counsel told the Petitioner about a client who had punched Counsel right before his trial and the trial court did not allow Counsel to withdraw.[1]

---

[1] Following the Petitioner's testimony on this issue, the post-conviction court stated, "And for the record, that was absolutely true. He swung a punch at [Counsel]."

- 3 -

Counsel testified that he was appointed to represent the Petitioner in general sessions court and in criminal court. Throughout the representation, Counsel observed that the Petitioner would be insistent about a particular issue and then back away from it. For example, he was insistent about finding "Elder Kiddington." Counsel was unable to locate him, so Counsel asked for the Petitioner's permission to approach the State about help in locating him. The Petitioner agreed, and the State found David Kiddington. According to the State, Mr. Kiddington was a Mormon who lived in Utah and would testify that he and another Mormon man had met with the Petitioner on the day of the murder. According to Mr. Kiddington, the Petitioner told them he was going to kill his wife. The two men stayed and talked with the Petitioner, attempting to talk him out of killing her. They even bought the Petitioner a bus ticket to Chicago, where he had family, to get him out of town and away from Brendia Simmons. The men drove the Petitioner to the bus station, dropped him off and believed he had boarded the bus. The Petitioner, however, "wait[ed] inside and left after they had driven off." Counsel stated that his investigator spoke directly with Mr. Kiddington to confirm that this version of events would be his testimony at trial.

Counsel testified about the phone records that the Petitioner sought. Counsel obtained the phone records, which did not show a call from the Petitioner's number to his mother's number. The State informed Counsel that this was because the Petitioner had used someone else's phone to make the call. Therefore, the phone records supported the State's theory of the case and did not benefit the defense.

Counsel testified that the State had several witnesses who were to testify that the Petitioner had told them either the day before or hours before the murder of his intention to kill Brendia Simmons. Counsel said that his trial strategy was to show that the Petitioner was a likeable, jovial individual, who had never caused Brendia Simmons any harm. His approach was to show that it was not a premeditated murder but an accident and that his statements about killing Brendia Simmons were not to be taken seriously because he commonly joked with his family. Counsel said that he was prepared to go to trial and was surprised that the case settled on the morning of trial. He denied that there were any conversations with the State about the potential of the death penalty. He stated that he was not death penalty certified so had there been any discussion of the death penalty, another attorney would have been appointed to the case.

Counsel recalled the morning of trial. He said that he went back to the holding cell and found the Petitioner had not dressed for trial. When he inquired about why he was not dressed, the Petitioner stated that he planned to plead guilty. Counsel responded, "I don't know why you would do that you literally have nothing to lose. If you plead you are getting life in prison with the possibility of parole and if you go to trial and lose,

that's what could happen." The Petitioner told Counsel that he did not want to put his family through a trial and that he did not want his mother there.

Counsel testified that the Petitioner was consistent in his position that the killing was an accident. The Petitioner's focus on the facts to support his contention varied, but he was resolute that Brendia Simmons' death was an accident. The Petitioner told Counsel that his daughter was angry, that the phone records would support his theory, that the "Mormons" would refute the State's evidence, and then he offered a "theory" on why a State's witness would lie at trial. Counsel stated that he pursued every "avenue" the Petitioner presented to him as a possible defense.

Counsel confirmed that, during the plea colloquy, the trial court reviewed the Petitioner's potential sentencing if he proceeded to trial and was found guilty. Counsel recalled that on the morning the Petitioner pleaded guilty he appeared "very lucid, very conversational."

On cross-examination, Counsel testified that he reviewed with the Petitioner, as did the trial court, the Petitioner's potential sentence if he was convicted at trial. He stated that he felt prepared for the case on the morning of trial. He noted that the Petitioner was "a likeable guy," and he believed that the Petitioner had "as good a chance as anybody to convince [the jury] that this was an accident." The Petitioner had indicated that he planned to testify at trial. Counsel affirmatively denied telling the Petitioner the death penalty was an option in post-trial sentencing.

After hearing the evidence, the post-conviction court found that the Petitioner had not proven his allegations by clear and convincing evidence and denied relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel at trial. He argues that Counsel failed to properly advise the Petitioner before his guilty plea; therefore, his guilty plea was involuntary. The State responds that the post-conviction court properly denied relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the

"distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that there "is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

In his petition, the Petitioner alleged numerous deficiencies in Counsel's representation. On appeal, however, he maintains only his complaint regarding Counsel's ineffective representation based upon Counsel's "threat" of the possibility of the death sentence if the Petitioner proceeded to trial. In its order denying relief, the post-conviction found, as to this issue,

> No proof was offered at the hearing on this petition of any threats made to the [P]etitioner by the prosecutors, other than the [P]etitioner's testimony that [Counsel] told him they would seek the death penalty if he did not

plead guilty on the day of trial, which this court has found not credible. . . . The proof at the hearing showed that [Counsel] advised against his pleading guilty, because he would have nothing to lose by going to trial. This allegation has no basis in fact. This court finds that he entered a plea of guilty because he was guilty, and because he knew that his mother, daughter, other family members and some Mormon missionaries were going to testify against him that he declared his intent to kill his wife before he killed her, and he then left her body at the house to go party with friends with her blood still on his clothes. When this court examined him during the guilty plea *voir dire* and went over the elements of the offense with him, warning him about the penalty of perjury, he admitted that he unlawfully killed his wife intentionally, and premeditated the killing. When asked by this court "did you premeditate this act after exercise of reflection and judgment, forming the intent to kill her, prior to killing her," he answered in the affirmative. He was then asked, "there was some point at which you weren't in the heat of passion, and you decided, 'I'm going to kill her,' and you planned it, and then you executed it. Is that correct?" He answered in the affirmative to that question as well. This allegation has no basis in fact.

The post-conviction court stated that the Petitioner had failed to show deficiency or any resulting prejudice. The post-conviction court found that the Petitioner's plea "was freely and voluntarily made, and knowingly and intelligently entered into, with an understanding of the nature and consequences of his plea," noting that it had "carefully and thoroughly examined the [P]etitioner when he entered his plea of guilty." Additionally, the post-conviction court found

> the proof of premeditated murder was overwhelming, and that [the Petitioner] entered a plea of guilty because he was guilty, and had confessed his intent to commit the crime before he committed it to several family members, negating his defense of accident. He waived his right to trial . . . against the advice of counsel, because he did not want to put his family through the ordeal of having to testify against him only to result in the same life sentence he received by pleading guilty."

After reviewing the Petitioner's contention, the record, and the post-conviction court's findings, we conclude that the Petitioner has not proven he is entitled to post conviction relief. The Petitioner testified that he met with Counsel numerous times in preparation for trial which is consistent with Counsel's testimony about his readiness for trial. Counsel testified that he was surprised on the day of trial to find the Petitioner not dressed for trial. Counsel testified that, when the Petitioner stated his intent to plead

guilty, he tried to dissuade the Petitioner because the Petitioner "had nothing to lose" in respect to potential sentencing following a trial. The post-conviction court found that the Petitioner's testimony was not credible and credited Counsel's testimony. We defer to the post-conviction court's findings regarding the credibility of witnesses. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn.1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn.1997). The Petitioner's mother and family members were to testify against him at trial. This fact provided incentive for the Petitioner to plead guilty in order to prevent his family from having to testify against him. Finally, the trial court reviewed with the Petitioner the potential sentences if convicted, which did not include the death penalty, and the Petitioner confirmed his understanding of sentencing with the trial court. Counsel denied the death penalty was ever discussed as a potential punishment and denied ever speaking with the Petitioner about the death penalty as a possible sentence.

Accordingly, we conclude that the Petitioner failed to show by clear and convincing evidence that Counsel falsely threatened that the Petitioner could be sentenced to death if he proceeded to trial and that this threat induced the Petitioner to plead guilty. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE